630 F.2d 950
 6 Fed. R. Evid. Serv. 1071
 Richard F. DAWSON and Diana Dawson, Individually and Diana
Dawson as parent and natural Guardian of Bryan
Dawson, a minor,
v.
CHRYSLER CORPORATION, Defendant-Third Party Plaintiff,
v.
TOWNSHIP OF PENNSAUKEN, Delta Leasing Company and Cherry
Hill Dodge, Inc., Third Party Defendants,
v.
TOWNSHIP OF PENNSAUKEN, Fourth Party Plaintiff,
v.
CUMBERLAND MUTUAL FIRE INSURANCE COMPANY, Fourth Party Defendant,
v.
PEERLESS INSURANCE COMPANY, Fourth Party Defendant,
Defendant, Chrysler Corporation, Appellant.
 No. 79-1363.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 7, 1980.
Reargued April 30, 1980.
Decided Sept. 11, 1980.
 
 Harry A. Short, Jr. (argued), Philadelphia, Pa., for appellant; Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., of counsel.
 James E. Beasley (argued), Daniel L. Thistle, Philadelphia, Pa., for appellees; Beasley, Hewson & Casey, Philadelphia, Pa., of counsel.
 Before ADAMS, VAN DUSEN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This appeal from a jury verdict and entry of judgment in favor of the plaintiffs arises out of a New Jersey automobile accident in which a police officer was seriously injured. The legal questions in this diversity action, that are governed by New Jersey law, are relatively straight-forward. The public policy questions, however, which are beyond the competence of this Court to resolve and with which Congress ultimately must grapple, are complex and implicate national economic and social concerns.
 
 
 2
 In adjudicating this appeal, we first decide the question whether the district court erred in denying the defendant's motion for judgment notwithstanding the verdict. We then turn to the issue whether certain evidentiary mistakes were committed, which would require a new trial. The third substantive question relates to the propriety of the computation of prejudgment interest. Finally, we address the troubling public policy dilemma namely, that under existing federal law individual juries in the various states are permitted, in effect, to establish national automobile safety standards. The result of such an arrangement, predictably, is not only incoherence in the safety requirements set by disparate juries, but also the possibility that a standard established by a jury in a particular case will conflict with other policies regarding the economics of the automobile industry as well as energy conservation programs.
 
 I. FACTUAL BACKGROUND
 
 3
 On September 7, 1974, Richard F. Dawson, while in the employ of the Pennsauken Police Department, was seriously injured as a result of an automobile accident that occurred in Pennsauken, New Jersey. As Dawson was driving on a rain-soaked highway, responding to a burglar alarm, he lost control of his patrol car a 1974 Dodge Monaco. The car slid off the highway, over a curb, through a small sign, and into an unyielding steel pole that was fifteen inches in diameter. The car struck the pole in a backwards direction at a forty-five degree angle on the left side of the vehicle; the point of impact was the left rear wheel well. As a result of the force of the collision, the vehicle literally wrapped itself around the pole. The pole ripped through the body of the car and crushed Dawson between the seat and the "header" area of the roof, located just above the windshield. The so-called "secondary collision" of Dawson with the interior of the automobile dislocated Dawson's left hip and ruptured his fifth and sixth cervical vertebrae. As a result of the injuries, Dawson is now a quadriplegic. He has no control over his body from the neck down, and requires constant medical attention.
 
 
 4
 Dawson, his wife, and their son brought suit in the Court of Common Pleas of Philadelphia against the Chrysler Corporation, the manufacturer of the vehicle in which Dawson was injured. Chrysler removed the case to the United States District Court for the Eastern District of Pennsylvania, 28 U.S.C. § 1441(a) (1976), on the grounds of diversity, and subsequently had the case transferred to the District Court for the District of New Jersey.[1] Id. § 1404(a). The plaintiffs' claims were based on theories of strict products liability and breach of implied warranty of fitness. They alleged that the patrol car was defective because it did not have a full, continuous steel frame extending through the door panels, and a cross-member running through the floor board between the posts located between the front and rear doors of the vehicle. Had the vehicle been so designed, the Dawsons alleged, it would have "bounced" off the pole following relatively slight penetration by the pole into the passenger space.
 
 
 5
 Expert testimony was introduced by the Dawsons to prove that the existing frame of the patrol car was unable to withstand side impacts at relatively low speed, and that the inadequacy of the frame permitted the pole to enter the passenger area and to injure Dawson. The same experts testified that the improvements in the design of the frame that the plaintiffs proposed were feasible and would have prevented Dawson from being injured as he was. According to plaintiffs' expert witnesses, a continuous frame and cross-member would have deflected the patrol car away from the pole after a minimal intrusion into the passenger area and, they declared, Dawson likely would have emerged from the accident with only a slight injury.
 
 
 6
 In response, Chrysler argued that it had no duty to produce a "crashproof" vehicle, and that, in any event, the patrol car was not defective. Expert testimony for Chrysler established that the design and construction of the 1974 Dodge Monaco complied with all federal vehicle safety standards,[2] and that deformation[3] of the body of the vehicle is desirable in most crashes because it absorbs the impact of the crash and decreases the rate of deceleration on the occupants of the vehicle. Thus, Chrysler's experts asserted that, for most types of automobile accidents, the design offered by the Dawsons would be less safe than the existing design. They also estimated that the steel parts that would be required in the model suggested by the Dawsons would have added between 200 and 250 pounds to the weight, and approximately $300 to the price of the vehicle. It was also established that the 1974 Dodge Monaco's unibody construction was stronger than comparable Ford and Chevrolet vehicles.
 
 
 7
 After all testimony had been introduced, Chrysler moved for a directed verdict, which the district judge denied. The jury thereupon returned a verdict in favor of the plaintiffs. In answers to a series of special interrogatories, the jurors concluded that (1) the body structure of the 1974 Dodge Monaco was defective and unreasonably dangerous; (2) Chrysler breached its implied warranty that the vehicle would be fit for use as a police car; (3) as a result of the defective design and the breach of warranty, Dawson sustained more severe injuries than he would have incurred had Chrysler used the alternative design proposed by Dawsons expert witnesses; (4) the defective design was the proximate cause of Dawson's enhanced injuries; and (5) Dawson's failure to use a seatbelt was not a proximate cause of his injuries. The jury awarded Mr. Dawson $2,064,863.19 for his expenses, disability, and pain and suffering, and granted Mrs. Dawson $60,000.00 for loss of consortium and loss of services. After the district court entered judgment,[4] Chrysler moved for judgment notwithstanding the verdict or, alternatively for a new trial. The court denied both motions. The Dawsons then requested pre-judgment interest of eight percent per annum of the damages award, accruing from the time suit was instituted to the date of the judgment. The trial judge granted the request in the amounts of.$388,012.53 for Mr. Dawson and $11,274.72 for Mrs. Dawson.
 
 
 8
 On appeal, Chrysler raises the following contentions: (1) It owed no duty to the Dawsons to manufacture an automobile that would withstand the type of collision that occurred here. (2) The evidence presented by the Dawsons was insufficient to establish that the patrol car was defective and unreasonably dangerous or that Chrysler breached an implied warranty of fitness. (3) The evidence did not sufficiently establish that Dawson's injuries in fact were caused by the allegedly defective design. (4) The trial court erred in permitting Dawsons' attorney to use documents containing the results of automobile safety tests in cross-examining one of Chrysler's expert witnesses without first establishing the reliability of the documents. (5) The district court erred in permitting the jurors to take into the jury room a copy of portions of a Calspan automobile safety report. (6) The trial judge erred in granting the Dawsons' motion for prejudgment interest.
 
 
 9
 We affirm.
 
 II. DISCUSSION
 
 10
 At the outset, it is important, indeed crucial, to point out, that the substantive issues of this diversity case are controlled by the law of New Jersey.
 
 A. Judgment Notwithstanding the Verdict
 
 11
 Dawsons' claims are premised on two legal theories strict tort liability and breach of an implied contractual warranty. As we recognized in Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976), under the law of New Jersey, the governing principles of strict liability and the implied warranty theory are identical.[5] Accordingly, we proceed with the adjudication of this appeal pursuant to the rubric of strict liability.
 
 
 12
 Under New Jersey law, a defendant in a tort action may not be held liable unless he owes a duty of care to the plaintiff. The question of duty is to be resolved in the first instance by the trial court. If such a duty exists, then a jury in a strict liability action must decide two factual questions: (1) whether the product at issue was defective; and (2) whether the defective product was a proximate cause of the plaintiff's injuries. Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 176, 406 A.2d 140, 153 (1979). With these guidelines in mind, we turn to the contentions set forth by Chrysler in its appeal from the denial of its motion for judgment notwithstanding the verdict.
 
 1. Duty
 
 13
 The New Jersey Supreme Court recently reviewed the concept of duty in tort actions and concluded that "(t)he question is ultimately one of public policy," and the answer "depends upon a balancing of the nature of the risk, the public interest and the relationship of the parties." Id. at 172, 406 A.2d at 151. The policies underlying the concept of duty include "the economic good of the group, practical administration of the law, justice between the parties and other considerations relative to the environment out of which the case arose." Id. (quoting Green, Duties, Risks, Causation, Doctrines, 41 Texas L.Rev. 42, 45 (1962)).
 
 
 14
 Chrysler urges that the district court erred in holding that it had a duty of care towards Dawson because it had no obligation to manufacture a vehicle that would protect a passenger against the type of harm suffered by Dawson. As we understand Chrysler's argument, however, it appears to be directed, not to Chrysler's duty vis-a-vis Dawson, but rather to the question whether the patrol car was defective inasmuch as it did not adequately prevent Dawson from sustaining serious injury. For, as we stated in Huddell, it is "beyond peradventure that an automobile manufacturer today has some legal obligation to design and produce a reasonably crashworthy vehicle. . . . Rephrased in the terminology of strict liability, the manufacturer must consider accidents as among the 'intended' uses of its products," and passengers injured in such accidents as among the group of reasonably foreseeable plaintiffs. 537 F.2d at 735. Thus, Chrysler had a duty to protect Dawson, as well as other users of its vehicles, against harm resulting from automobile accidents such as that which occurred here. Whether Chrysler may be held liable depends, of course, on concomitant findings that Chrysler breached this duty by producing a patrol car that was defective, and that the defective product proximately caused Dawson's injuries.
 
 2. Defective Product
 
 15
 Thus, the controlling issue in the case is whether the jury could be permitted to find, under the law of New Jersey, that the patrol car was defective. In Suter, the New Jersey Supreme Court summarized its state's law of strict liability as follows:
 
 
 16
 If at the time the seller distributes a product, it is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes so that users or others who may be expected to come in contact with the product are injured as a result thereof, then the seller shall be responsible for the ensuing damages.
 
 
 17
 81 N.J. at 169, 406 A.2d at 149 (footnote omitted). The court, in adopting this test, specifically rejected the requirement of the Restatement (Second) of Torts § 402A that the defect must cause the product to be "unreasonably dangerous to the user or consumer."[6] In the court's view, "the Restatement language may lead a jury astray for '(i)t may suggest an idea like ultra-hazardous, or abnormally dangerous, and thus give rise to the impression that the plaintiff must prove that the product was unusually or extremely dangerous.' " 81 N.J. at 175, 406 A.2d at 151 (quoting Wade, On the Nature of Strict Liability for Products, 44 Miss.L.J. 825, 832 (1973)).
 
 
 18
 The determination whether a product is "reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes" is to be informed by what the New Jersey Supreme Court has termed a "risk/utility analysis." Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152, 172-79, 386 A.2d 816, 825-29 (1978). Under this approach, a product is defective if "a reasonable person would conclude that the magnitude of the scientifically perceivable danger as it is proved to be at the time of trial outweighed the benefits of the way the product was so designed and marketed." Id. at 172-73, 386 A.2d at 826 (quoting Keeton, Products Liability and the Meaning of Defect, 5 St. Mary's L.J. 30, 37-38 (1973) (emphasis in original)). The court in Cepeda, relying heavily on the article by Dean John Wade, referred to in Suter, identified seven factors that might be relevant to this balancing process:
 
 
 19
 (1) The usefulness and desirability of the product its utility to the user and to the public as a whole.
 
 
 20
 (2) The safety aspects of the product the likelihood that it will cause injury, and the probable seriousness of the injury.
 
 
 21
 (3) The availability of a substitute product which would meet the same need and not be as unsafe.
 
 
 22
 (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
 
 
 23
 (5) The user's ability to avoid danger by the exercise of care in the use of the product.
 
 
 24
 (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
 
 
 25
 (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.
 
 
 26
 Id. at 173-74, 386 A.2d at 826-27 (quoting Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 837-38 (1973). The court suggested that the trial judge first determine whether a balancing of these factors precludes liability as a matter of law. If it does not, then the judge is to incorporate into the instructions any factor for which there was presented specific proof and which might be deemed relevant to the jury's consideration of the matter. Id.
 
 
 27
 Chrysler maintains that, under these standards, the district court erred in submitting the case to the jury because the Dawsons failed, as a matter of law, to prove that the patrol car was defective. Specifically, it insists that the Dawsons did not present sufficient evidence from which the jury reasonably might infer that the alternative design that they proffered would be safer than the existing design, or that it would be cost effective, practical, or marketable. In short, Chrysler urges that the substitute design would be less socially beneficial than was the actual design of the patrol car. In support of its argument, Chrysler emphasizes that the design of the 1974 Dodge Monaco complied with all of the standards authorized by Congress in the National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. 89-563, tit. I, § 107, 80 Stat. 718, codified in 15 U.S.C. § 1396 (1976), and set forth in accompanying regulations, 49 C.F.R. § 571.1 (1979).
 
 
 28
 Compliance with the safety standards promulgated pursuant to the National Traffic and Motor Vehicle Safety Act, however, does not relieve Chrysler of liability in this action. For, in authorizing the Secretary of Transportation to enact these standards, Congress explicitly provided, "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." 15 U.S.C. § 1397(c) (1976). Thus, consonant with this congressional directive, we must review Chrysler's appeal on the question of the existence of a defect under the common law of New Jersey that is set forth above.
 
 
 29
 Our examination of the record persuades us that the district court did not err in denying Chrysler's motion for judgment notwithstanding the verdict. The Dawsons demonstrated that the frame of the 1974 Dodge Monaco was noncontinuous that is, it consisted of a front portion that extended from the front of the car to the middle of the front passenger seat, and a rear portion that ran from the middle of the rear passenger seat to the back end of the vehicle. Thus, there was a gap in the seventeen-inch side area of the frame between the front and rear seats. The plaintiffs also proved that, after colliding with the pole, the car slid along the left side portion of the rear frame until it reached the gap in the frame. At that point, the pole tore through the body of the vehicle into the passenger area and proceeded to push Dawson into the header area above the windshield.
 
 
 30
 Three experts a design analyst, a mechanical engineer, and a biochemical engineer also testified on behalf of the Dawsons. These witnesses had examined the patrol car and concluded that it was inadequate to withstand side impacts. They testified that there was an alternative design available which, had it been employed in the 1974 Monaco, would have prevented Dawson from sustaining serious injuries. The substitute design called for a continuous frame with an additional cross member running between the so-called B-posts the vertical posts located at the side of the car between the front and rear seats. According to these witnesses, this design was known in the industry well before the accident and had been tested by a number of independent testing centers in 1969 and in 1973.
 
 
 31
 The mechanical engineer conducted a number of studies in order to ascertain the extent to which the alternative design would have withstood the crash. On the basis of these calculations, he testified that the pole would have penetrated only 9.9 inches into the passenger space, and thus would not have crushed Dawson. Instead, the engineer stated, the car would have deflected off the pole and back into the highway. Under these circumstances, according to the biochemical engineer, Dawson would have been able to "walk away from the accident" with but a bruised shoulder.
 
 
 32
 Also introduced by the Dawsons were reports of tests conducted for the United States Department of Transportation, which indicated that, in side collisions with a fixed pole at twenty-one miles per hour,[7] frame improvements similar to those proposed by the experts presented by the Dawsons reduced intrusion into the passenger area by fifty percent, from sixteen inches to eight inches. The study concluded that the improvements, "in conjunction with interior alterations, demonstrated a dramatic increase in occupant protection."[8] There was no suggestion at trial that the alternative design recommended by the Dawsons would not comply with federal safety standards. On cross-examination, Chrysler's attorney did get the Dawsons' expert witnesses to acknowledge that the alternative design would add between 200 and 250 pounds to the vehicle and would cost an additional $300 per car. The Dawsons' experts also conceded that the heavier and more rigid an automobile, the less able it is to absorb energy upon impact with a fixed object, and therefore the major force of an accident might be transmitted to the passengers. Moreover, an expert for Chrysler testified that, even if the frame of the patrol car had been designed in conformity with the plaintiffs' proposals, Dawson would have sustained injuries equivalent to those he actually incurred. Chrysler's witness reasoned that Dawson was injured, not by the intrusion of the pole into the passenger space, but as a result of being thrown into the header area of the roof by the vehicle's initial contact with the pole that is, prior to the impact of the pole against the driver's seat.
 
 
 33
 On the basis of the foregoing recitation of the evidence presented respectively by the Dawsons and by Chrysler, we conclude that the record is sufficient to sustain the jury's determination, in response to the interrogatory, that the design of the 1974 Monaco was defective. The jury was not required to ascertain that all of the factors enumerated by the New Jersey Supreme Court in Cepeda weighed in favor of the Dawsons in order to find the patrol car defective. See p. 957 supra. Rather, it need only to have reasonably concluded, after balancing these factors, that, at the time Chrysler distributed the 1974 Monaco, the car was "not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes." Suter, 81 N.J. at 169, 406 A.2d at 149. Moreover, our role in reviewing the record for purposes of determining whether a trial judge erred in denying a motion for a directed verdict or for judgment notwithstanding the verdict is necessarily a limited one. As we stated in Huddell, " 'The Seventh Amendment bars appellate review of facts found by a jury in actions at common law . . . .' " 537 F.2d at 736 (quoting 9 C. Wright & A. Miller, Federal Practice and Procedure § 2571, at 681 (1971)). Thus, we are admonished to review the record in this case in the light most favorable to the nonmoving party, the Dawsons, and to affirm the judgment of the district court denying the motions unless the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir. 1969); accord, Huddell, 537 F.2d at 737. We hold that it is not.
 
 3. Proximate Cause
 
 34
 The remaining question in regard to the motion for judgment notwithstanding the verdict is whether the Dawsons presented sufficient evidence to permit the jury reasonably to conclude that the design defect was the proximate cause of Dawson's injuries. In this regard, Chrysler advances three arguments. First, it urges that the patrol car was substantially modified by Dawson's employer in such a way that the car, as sold by Chrysler, could not be said to have caused the injuries. Second, it maintains that Dawson's failure to wear a seat belt was, in fact, the proximate cause of his injuries.[9] Third, it claims that there was insufficient evidence that the defect caused Dawson to suffer more severe injuries than he would have incurred had the alternative design been employed that is, had the patrol car not been defective.
 
 
 35
 Counsel for the Dawsons conceded that the patrol car had been modified by the addition of a tubular roll bar and a wire mesh screen that extended between the front and rear passenger areas in order to separate the police officer from suspects. Dawsons' expert witnesses testified, however, that this alteration neither compromised the structural integrity of the vehicle, nor in any way contributed to Dawson's injuries. In contrast, the expert witnesses for Chrysler testified merely that they were not certain whether the modifications affected Dawson's injuries. Under these circumstances, the jury's implicit conclusion that the alterations were not the proximate cause of Dawson's injuries is supported by the evidence.
 
 
 36
 The jury specifically found in interrogatory five that Dawson's failure to wear his seatbelt was not a proximate cause of his injuries. Chrysler presented expert testimony that Dawson was injured when he "ramped" up the back seat into the roof of the car that is, as he slid upwards out of his seat along the back rest following the vehicle's initial impact with the pole. It argues therefore that, if Dawson had been wearing a seatbelt, he would not have been thrown out of the seat and would not have smashed into the roof of the car. Chrysler maintains that the jury's verdict is inconsistent with this testimony.
 
 
 37
 In Huddell, we noted in reviewing on appeal a question regarding causation that "the credibility of opinion evidence is for the fact-finder." 537 F.2d at 737. Here, the Dawsons presented expert witnesses who contradicted Chrysler's theory of causation. Observing initially that the patrol car was moving backwards at a forty-five degree angle at the time of impact, the witnesses opined that the force of the collision must have pushed Dawson's back and left shoulder against the rear of the seat. Under these circumstances, they concluded, he did not "ramp" up the seat into the roof, but remained in the seat until the pole entered the passenger space, collided with the rear of the seat, and pushed both the seat and Dawson into the ceiling. In other words, had the pole been prevented from crushing up against the rear of the driver's seat, Dawson would not have been thrown into the ceiling. This testimony was corroborated by a third expert, who stated that the nature of Dawson's dislocated hip indicated that he was not thrown from the seat as Chrysler's witnesses maintained. The jurors reasonably could have found the testimony offered by the Dawsons' witnesses to be more persuasive than Chrysler's. Accordingly, Chrysler's contention that the jury's verdict is at odds with the evidence is without merit.
 
 
 38
 Chrysler's last argument regarding causation is that the plaintiffs failed to prove that Dawson's injuries were enhanced as a result of the design-defect in the patrol car. As with the other contentions, the record does not support this claim. The Dawsons presented expert testimony that the alternative design would have prevented the pole from intruding far enough into the passenger space to hit the front seat. And, as we have just observed, there was testimony that Dawson was not thrown into the ceiling of the car, but rather was crushed up against the roof as the pole forced the passenger seat into the roof. Had Dawson remained in his seat from gravity forces, and had the seat not been jammed against the roof, it is a reasonable inference that his cervical vertebrae would not have been ruptured. Indeed, the biochemical engineer who evaluated the accident and testified for the Dawsons concluded that, if the pole had not entered the patrol car and crushed Dawson, the officer would have suffered no more than a bruised shoulder. In view of this testimony, we cannot say that the jury's verdict on the question of proximate cause is unsupported by the record.
 
 4. Summary
 
 39
 Inasmuch as we conclude that it was not incorrect for the district court to hold that Chrysler had a legal duty to protect Dawson against the type of accident in which he was injured, and because the jury's findings that the 1974 Monaco was not reasonably fit to withstand the accident and that the defect proximately caused Dawson's injuries were supported by the evidence, the district court did not err in denying Chrysler's motion for judgment notwithstanding the verdict.
 
 B. New Trial
 1. Admissibility of Calspan Report
 
 40
 During cross-examination of one of Chrysler's expert witnesses, the attorney for the Dawsons referred to the conclusions reached in two reports on the subject of automobile crashworthiness. These reports were prepared for the United States Department of Transportation by the Calspan Corporation (formerly the Cornell Aeronautical Laboratory, Inc.) of Buffalo, New York. Quotations from documents of this kind are admissible under the exception to the hearsay rule contained in Fed.R.Evid. 803(18), which provides:
 
 
 41
 To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.
 
 
 42
 In this case, the authoritativeness of the reports was inferentially conceded by one of Chrysler's expert witnesses. When asked by Dawsons' counsel, "since you calculated some data from them, they're reliable in that regard, aren't they," the witness replied: "Well, I have no reason to doubt their test data reflected in (the) reports." Moreover, Chrysler did not object to the use of the Calspan report. Accordingly, we hold that the Dawsons' use during cross-examination of the Calspan reports was not precluded by Rule 803(18).
 
 
 43
 Chrysler also challenges the decision of the district court, following the conclusion of all testimony, to admit the Calspan reports into evidence as plaintiffs' exhibits 110 and 111. At the time the reports were offered, Chrysler did not object to their admissibility. Although Rule 803(18) provides that such reports or treatises not be received as exhibits, in light of the fact that there was no objection to the reports and inasmuch as the jurors did not take them into the jury room during their deliberations, we conclude that the error here, if any, was harmless.
 
 2. Jury's Use of Diagram
 
 44
 One page of one of the Calspan reports, which contained a diagram of the exterior deformation of a test car following a side collision with a stationary pole, was introduced as plaintiffs' exhibit 107, and was taken by the jurors into the jury room when they retired to decide the case. Chrysler objected to neither the admission of the document nor to the jury's use of it. On appeal, however, it urges that the admission and use by the jury of the diagram constitutes reversible error.
 
 
 45
 Although the admission of the document as an exhibit abridged the terms of Rule 803(18), we cannot say, in view of Chrysler's failure to object, that the district court committed reversible error in this regard. Even assuming arguendo that the trial court erred, in the context of this case the error was harmless. Independent of the exhibit, there was testimony regarding the contents of the Calspan report, including the diagram in question. Counsel for the Dawsons extensively cross-examined one of Chrysler's experts about the tests diagrammed in the exhibit. In short, the exhibit was merely duplicative of the testimony. Cf. Ammar v. American Export Lines, Inc., 326 F.2d 955, 957 n. 2 (2d Cir.) (plaintiff's counsel's reading during closing argument of a physician's report that was not admitted into evidence held harmless error because the report "said in substance what the doctor had stated on the stand"), cert. denied, 379 U.S. 824, 85 S.Ct. 48, 13 L.Ed.2d 34 (1964).
 
 
 46
 For these reasons, the district court did not err in denying Chrysler's motion for a new trial.
 
 C. Prejudgment Interest
 
 47
 Chrysler's final argument is that the district court improperly computed the amount of prejudgment interest recoverable by the Dawsons. Specifically, it urges that prejudgment interest is not available on the portion of the damages award that will be used to pay the contingent fee owed to plaintiffs' counsel or on that portion of the award on which Dawson's workers compensation insurer has a lien.
 
 
 48
 Prejudgment interest in New Jersey tort actions is authorized by Rule 4:42-11(b) of the Civil Practice Rules Governing the Courts of the State of New Jersey (West 1979), which states:
 
 
 49
 (T)he court shall, in tort actions, including products liability actions, include in the judgment simple interest at 8% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date of the tort, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. The contingent fee of an attorney shall not be computed on the interest so included in the judgment.
 
 
 50
 No New Jersey case dealing with the issues raised in Chrysler's contentions regarding prejudgment interest has come to our attention. Moreover, Rule 4:42-11(b) itself provides no indication that the New Jersey Supreme Court, in adopting the Rule, intended to exclude from prejudgment interest the portion of the damage award owing to plaintiffs' counsel and Dawson's compensation carrier.[10] Under these circumstances, we decline to carve out of the rule the exemptions from prejudgment interest urged by Chrysler. In the absence of some authority for the creation of such exemptions, Chrysler's arguments which may well have merit are best directed to the drafters of the Rule, the New Jersey Supreme Court, or to the New Jersey legislature.
 
 III. CONCLUSION
 
 51
 Although we affirm the judgment of the district court, we do so with uneasiness regarding the consequences of our decision and of the decisions of other courts throughout the country in cases of this kind.
 
 
 52
 As we observed earlier, (see p. 957 supra) Congress, in enacting the National Traffic and Motor Vehicle Safety Act, provided that compliance with the Act does not exempt any person from liability under the common law of the state of injury. The effect of this provision is that the states are free, not only to create various standards of liability for automobile manufacturers with respect to design and structure, but also to delegate to the triers of fact in civil cases arising out of automobile accidents the power to determine whether a particular product conforms to such standards. In the present situation, for example, the New Jersey Supreme Court has instituted a strict liability standard for cases involving defective products, has defined the term "defective product" to mean any such item that is not "reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes," and has left to the jury the task of determining whether the product at issue measures up to this standard.
 
 
 53
 The result of such arrangement is that while the jury found Chrysler liable for not producing a rigid enough vehicular frame, a factfinder in another case might well hold the manufacturer liable for producing a frame that is too rigid. Yet, as pointed out at trial, in certain types of accidents head-on collisions it is desirable to have a car designed to collapse upon impact because the deformation would absorb much of the shock of the collision, and divert the force of deceleration away from the vehicle's passengers. In effect, this permits individual juries applying varying laws in different jurisdictions to set nationwide automobile safety standards and to impose on automobile manufacturers conflicting requirements. It would be difficult for members of the industry to alter their design and production behavior in response to jury verdicts in such cases, because their response might well be at variance with what some other jury decides is a defective design. Under these circumstances, the law imposes on the industry the responsibility of insuring vast numbers of persons involved in automobile accidents.
 
 
 54
 Equally serious is the impact on other national social and economic goals of the existing case-by-case system of establishing automobile safety requirements. As we have become more dependent on foreign sources of energy, and as the price of that energy has increased, the attention of the federal government has been drawn to a search to find alternative supplies and the means of conserving energy. More recently, the domestic automobile industry has been struggling to compete with foreign manufacturers which have stressed smaller, more fuel-efficient cars. Yet, during this same period, Congress has permitted a system of regulation by ad hoc adjudications under which a jury can hold an automobile manufacturer culpable for not producing a car that is considerably heavier, and likely to have less fuel efficiency.
 
 
 55
 In sum, this appeal has brought to our attention an important conflict that implicates broad national concerns. Although it is important that society devise a proper system for compensating those injured in automobile collisions, it is not at all clear that the present arrangement of permitting individual juries, under varying standards of liability, to impose this obligation on manufacturers is fair or efficient. Inasmuch as it was the Congress that designed this system, and because Congress is the body best suited to evaluate and, if appropriate, to change that system, we decline today to do anything in this regard except to bring the problem to the attention of the legislative branch.
 
 
 56
 Bound as we are to adjudicate this appeal according to the substantive law of New Jersey, and because we find no basis in that law to overturn the jury's verdict, the judgment of the district court will be affirmed.
 
 
 
 [1]
 Following transfer, Chrysler filed a third-party complaint against the Township of Pennsauken, Delta Leasing Co., and Cherry Hill Dodge, Inc. The Township then filed a fourth party complaint against the Cumberland Mutual Fire Insurance Co. and the Peerless Insurance Co. These parties are not involved in the present appeal
 
 
 [2]
 See 49 C.F.R. 571.1 (1979)
 
 
 [3]
 Deformation is a term used in this context to describe the collapsing of the body and frame of a vehicle upon impact with a stationary object
 
 
 [4]
 The judgment as originally filed by the district court did not resolve the claims involving the third- and fourth-party plaintiffs and defendants to this action. See note 1 supra. However, the district court filed a certificate under Fed.R.Civ.P. 54(b) on January 1, 1980, certifying that a final judgment was entered with respect to the Dawsons' claims against Chrysler, even though judgment had not yet been entered in the third- and fourth-party actions. Inasmuch as this certificate was entered prior to the argument before this Court, and because neither party is prejudiced by the late filing of the Rule 54(b) certificate, we have appellate jurisdiction. Tilden Financial Corp. v. Palo Tire Serv., 596 F.2d 604, 606-07 (3d Cir. 1979)
 
 
 [5]
 Most jurisdictions do not treat the doctrines of strict liability and implied warranty as identical concepts. For example, most states do not permit a plaintiff to recover under strict liability where the only damages alleged are for injuries to the defective product itself that is, for the failure of the product to conform to the expectations of the buyer and the seller. Compare Santor v. A and M Karagheusian, Inc., 44 N.J. 52, 66, 207 A.2d 305, 312 (1965) with Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280 (3d Cir. 1980) (Illinois law and cases cited therein, at 287 & n.13)
 
 
 [6]
 Section 402A of the Restatement (Second) of Torts provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule in Subsection (1) applies although
 (a) The seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 [7]
 Eyewitness as well as expert testimony was introduced to show that the speed of the car at the time of impact was between twenty-four and twenty-six miles per hour
 
 
 [8]
 J. Greene, Basic Research in Crashworthiness II Development and testing of Vehicle Side Structure Modifications 151 (1973)
 
 
 [9]
 Dawson testified that, at the time of the accident, he was not wearing a seat belt, but that this was customary police practice in order to permit officers to enter and leave their vehicles as quickly as possible
 
 
 [10]
 Under the Rule, however, counsel for plaintiff will not receive any prejudgment interest