749 F.2d 162
 Joseph MARINO and Claide Marino, individually and as parents
and natural guardians of Maria Marino, a minor, Appellants,
v.
Roberto BALLESTAS, M.D., and Gnaden Huetten Memorial
Hospital, Appellees.
 No. 83-3546.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6) June 7, 1984.
Decided Nov. 28, 1984.
 
 Stephen T. Saltz, Robert J. Mongeluzzi, Daniels, Golden & Saltz, P.C., Philadelphia, Pa., for appellants.
 Joseph A. Lach, Hourigan, Kluger, Spohrer & Quinn, Wilkes-Barre, Pa., for appellee Ballestas.
 Frederick J. Fanelli, Edward H. Heitmiller, Heitmiller & Nickels, P.C., Pottsville, Pa., for appellee Gnaden Huetten Memorial Hosp.
 Before WEIS and BECKER, Circuit Judges, and ACKERMAN, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This is an appeal from a judgment in favor of the defendant in a medical malpractice case arising out of a snowmobile accident in which the plaintiffs' minor daughter fractured her right arm.[1] A jury rejected, inter alia, the plaintiffs' contention that they did not give informed consent for defendant, Roberto Ballestas, M.D., to perform surgery on their daughter because Dr. Ballestas had failed to inform them of the existence of an alternative, noninvasive method of treatment. The district court refused to grant the plaintiffs a judgment n.o.v. or a new trial, and they appealed. The primary question before us is whether the district court erred in concluding that there was sufficient evidence to support the jury's verdict regarding informed consent. We hold that the jury's verdict was against the weight of the evidence, and remand the case to the district court for a new trial on the informed consent claim. In all other respects, we affirm the judgment of the district court.
 
 I.
 
 2
 On February 18, 1980, Maria Marino, age eleven, fell from a snowmobile while vacationing with her parents in the Pocono Mountains. Maria sustained an injury to her upper right arm and was immediately transported from the accident site to Gnaden Huetten Memorial Hospital in Lehighton, Pennsylvania. After being examined by emergency room personnel, Maria was referred to Dr. Roberto Ballestas, an orthopedic surgeon.
 
 
 3
 In his examination of Maria, Dr. Ballestas noted limited lateral motion and weakness in her wrist, and virtually total loss of dorsiflexion. After the examination and review of Maria's x-rays, Dr. Ballestas diagnosed Maria's condition as a fractured right humerus with possible involvement of the radial nerve.
 
 
 4
 The testimony regarding what occurred after this point is in conflict. Dr. Ballestas testified that he explained to Maria's parents, appellants Joseph and Claide Marino, the need for immediate "open reduction" surgery to explore the radial nerve and thereby diminish the risk of permanent nerve damage. According to Dr. Ballestas, he informed the Marinos of his belief that any delay in treatment involved the possibility of further nerve damage and the potential loss of use of the arm. It is undisputed that the Marinos expressed the desire to have their daughter treated by their family orthopedic surgeon, Dr. Harold Friedman. Dr. Ballestas testified that he responded to this desire by telling the Marinos that they could take Maria home to be treated by another doctor, but that this course would risk permanent injury to Maria's arm.
 
 
 5
 According to Mrs. Marino's testimony, Dr. Ballestas never told her that Maria could be removed from the hospital. She testified that Dr. Ballestas told her that Maria would lose the use of her arm if it was not operated on within two hours, and that, as a result of Dr. Ballestas' comments, she felt that she never had the choice of removing Maria from the Gnaden Huetten Memorial Hospital and taking her home to New Jersey for treatment. Mr. Marino testified that he too was left with the distinct impression, after listening to Dr. Ballestas, that Maria could not leave the hospital because immediate surgery was the only treatment possible. Both parents stated that, had they been informed of a school of accepted medical thought that advocates immobilizing the arm and delaying surgery indefinitely, they would not have consented to immediate surgery and would have instead taken Maria home for treatment.
 
 
 6
 The parties agreed that, after Dr. Ballestas informed the Marinos that immediate surgery was indicated, Mrs. Marino telephoned Dr. Friedman for advice concerning the proposed surgery; they also agreed that Dr. Friedman did not speak with Dr. Ballestas regarding Maria's condition. Mrs. Marino testified that she conveyed to Dr. Friedman the information about Maria's arm given to her by Dr. Ballestas and asked Dr. Friedman whether the proposed surgery was appropriate. Mrs. Marino also testified that Dr. Friedman told her that the operation might be appropriate in some instances but that he could not determine whether this was such a case because he had not examined Maria or reviewed her x-rays.
 
 
 7
 Appellants gave their written consent to the operation and Dr. Ballestas performed the surgery. During the course of the open reduction and exploration of the radial nerve, Dr. Ballestas inserted a metal surgical plate and two screws into Maria's arm for the purpose of internal fixation. Because of Maria's complaints of sensitivity, Dr. Friedman removed the plate and screws from her arm several months after the original operation. Maria has regained full function of her arm, but she has a residual scar that may require surgical revision.
 
 
 8
 At trial, both sides offered medical experts. Plaintiffs called Dr. Friedman, who testified that in Maria's case there had been absolutely no need to explore the nerve. In his opinion, Maria's arm would have recovered without the surgery performed by Dr. Ballestas, and, therefore, a competent surgeon would not have undertaken the operation. Instead, he testified, the proper treatment would have been to immobilize the arm in plastic splints, which would have permitted Maria to travel without risking further damage.
 
 
 9
 Dr. Ballestas called two experts: Dr. Walter Finnegan, an orthopedic surgeon from Allentown, Pennsylvania, and Dr. Peter Lichtenfeld, a neurologist from New York City. Dr. Finnegan, while testifying that he and his colleagues in Allentown would have performed the immediate open reduction and exploratory surgery performed by Dr. Ballestas, acknowledged that there are two schools of medical thought about the appropriate treatment in cases like Maria's. He stated:
 
 
 10
 [T]here are at least two, for simplicity, two basic schools of thought, one which would say let the fracture heal and hope that the radial nerve returns ... and if not, go back later, months later, and explore the nerve. The other school, which I really feel is more conservative, but it would be viewed by some as more aggressive, is to open it or surgically explore it early.
 
 
 11
 During cross-examination, Dr. Finnegan testified that he would tell the parents of a patient in Maria's condition that
 
 
 12
 there were two options and that the expected outcome with one [immobilization] would be perhaps 80, 90 percent chance of recovery, based upon long-term statistical studies and what we have in the literature, but that there would be a period of probably six months wherein we would be wondering, waiting to find out whether the radial nerve recovered and that there might be a need for later surgical intervention in that instance ... that would be if I were to take an early nonoperative approach ... The other treatment alternative would be to surgically explore the fracture site and the radial nerve and in that instance, I would state that I personally would feel that we could then repair any damage which did occur, gross damage to the nerve, disruption, if you will, and even if we found the nerve to be intact, we would thereafter have peace of mind that recovery would occur ... But I do feel that both alternatives should be available, and the statistical chance of recovery offered.
 
 
 13
 Dr. Lichtenfeld testified that it was within accepted medical standards and practice to explore the radial nerve of an injury of the type sustained by Maria and that, in his opinion, this method would improve the chance of recovery. He also agreed, however, that immediate surgery is not the only form of treatment for the condition presented in Maria's case. Dr. Lichtenfeld stated that there is a greater than fifty percent chance that an injured radial nerve will recover spontaneously. He further testified that a patient in Maria's condition can be moved if the fracture is stabilized by a splint.
 
 
 14
 Dr. Ballestas, testifying on his own behalf, stated that there are two schools of medical thought concerning the appropriate treatment for Maria's injury: one that advocates operating immediately, and another that advocates immobilizing the arm and operating later. Although Dr. Ballestas' testimony is unclear on this point, the delayed surgery technique that he recognized would appear implicitly to include the possibility that spontaneous regeneration will occur without surgery. Dr. Ballestas testified without equivocation, however, that in Maria's case immediate surgery was the preferred course of action.
 
 II.
 
 15
 Plaintiffs instituted suit in the district court against Dr. Ballestas and Gnaden Huetten Memorial Hospital,[2] alleging negligence and lack of informed consent. The negligence theory was based on the contention that Dr. Ballestas, in both his decision to operate on Maria and in his performance of the surgery, did not exercise the care and judgment of a reasonably prudent person engaged in his specialty. Plaintiffs' theory of informed consent was also twofold: (1) that they were not adequately advised of alternative methods of treatment; and (2) that they were not informed that Dr. Ballestas would insert the metal surgical plate and did not consent to this procedure.[3]
 
 
 16
 The informed consent theory of "alternative procedures" was pleaded by plaintiffs in their complaint and was included in their pre-trial memorandum. The district court charged the jury with respect to both negligence and lack of informed consent, and the jury answered special interrogatories, pursuant to Fed.R.Civ.P. 49(b), which addressed both theories of liability.[4] The jury returned a verdict in favor of Dr. Ballestas, finding that plaintiffs had failed to prove negligence by Dr. Ballestas in his choice and performance of the operation and also that plaintiffs had failed to prove a lack of informed consent.
 
 
 17
 Following the jury's verdict, plaintiffs moved pursuant to Fed.R.Civ.P. 50(b) for judgment n.o.v. or, in the alternative, for a new trial. In a memorandum opinion, the district court summarily upheld the jury verdict with respect to the negligence claims.[5] The court found more problematic the verdict respecting the informed consent theory based on the existence of an alternative procedure, but declined to grant the motion on this ground for two reasons: first, the court suggested that plaintiffs had not really proceeded on the informed consent theory at trial, and second, the court found that the jury's verdict on this issue was supported by the evidence.
 
 
 18
 On appeal, the Marinos contend that the district court erred in denying their motions for a judgment n.o.v. or for a new trial because there is no evidence to support the conclusion that they rendered informed consent to the operation. Further, the Marinos argue that the district court erred in holding that they had not proceeded upon the alternative procedure theory at trial. Dr. Ballestas rejoins that there was sufficient evidence to support the jury's verdict that he had fulfilled his duty of disclosure to the Marinos.
 
 III.
 
 19
 In examining the district court's denial of appellants' motions for judgment n.o.v. or, in the alternative, for a new trial, we are required to "view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict." Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir.1979). We may reverse the judgment of the district court only if "the record 'is critically deficient of that minimum quantum of evidence from which a jury might reasonably [decline to] afford relief.' " Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980) (quoting Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir.1969) ), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Before we evaluate the evidence in light of this standard, we must review the legal elements of plaintiffs' claim against which the sufficiency of evidence must be judged.
 
 A.
 
 20
 Under Pennsylvania law,[6] absent an emergency situation, the patient's informed consent--or, if the patient is a minor, informed consent of the patient's parent or guardian--is a prerequisite to surgery. Gray v. Grunnagle, 423 Pa. 144, 155, 223 A.2d 663, 668-69 (1966); Cooper v. Roberts, 220 Pa.Super. 260, 265, 286 A.2d 647, 649 (1971); Dunham v. Wright, 423 F.2d 940, 943 (3d Cir.1970). Absent informed consent, an operation constitutes an assault on the patient by the physician who is liable for any resulting injuries. Such liability attaches regardless of whether the operation was negligently performed. Cooper, 220 Pa.Super. at 265, 286 A.2d at 649. The burden is on the plaintiff to prove that the operation was performed without the requisite consent. Dicenzo v. Berg, 340 Pa. 305, 307, 16 A.2d 15, 16 (1940).
 
 
 21
 The Pennsylvania Supreme Court has defined "informed consent" as consent made with knowledge and understanding of the nature of the undertaking. Gray, 423 Pa. at 166, 223 A.2d at 674. A patient can give informed consent only when he or she fully understands the nature of the proposed operation and is apprised of all of its possible consequences. Id. This court, in Dunham, 423 F.2d at 944, relying on the decision in Gray, stated:
 
 
 22
 Although it is not clearly articulated, a careful analysis of the rationale of the applicable citations, including Gray v. Grunnagle, indicates that before a patient will be deemed to give an informed consent, it may be necessary that he know the alternative methods of treatment available to him and the inherent dangers and possibilities of success of such alternatives. The philosophy behind such theory of informed consent is that the patient has the right and responsibility to determine whether he wants to risk the suggested corrective surgery. If a patient's decision is to be a knowing and intelligent one, he must understand in addition to the risks of the suggested surgery, the possible results of the failure to chance it. A complete understanding of the consequences of foregoing the operation would seem necessarily to include a consideration of the alternative treatment for the patient's disease or condition.
 
 
 23
 One year later, in Cooper, 220 Pa.Super. at 267-68, 286 A.2d at 650-51, the Pennsylvania Superior Court explicitly recognized a patient's right to be informed of all recognized alternative methods of treatment and stated that a physician fulfills his duty of disclosure only when "the physician [has] disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment." Id. at 267, 286 A.2d at 650.
 
 B.
 
 24
 An evaluation of the evidence produced at trial leads us to conclude that the verdict in favor of Dr. Ballestas on the informed consent issue was not supported by any evidence and cannot stand. First, the record discloses uncontradicted evidence of the existence of an alternative procedure. Dr. Ballestas and the two medical experts who testified on his behalf acknowledged that an established school of medical thought advocates immobilization of the arm to guard against further nerve damage, allowing time for spontaneous regeneration, with recourse to surgery only when and if regeneration does not occur.
 
 
 25
 Second, viewing the evidence in the light most favorable to defendant, as we must, the record nonetheless shows that Dr. Ballestas failed to advise the Marinos of the existence of this alternative procedure, thereby breaching his duty of disclosure. According to Dr. Ballestas, he told the Marinos that they were free to remove Maria from the hospital, but he qualified this statement with the warning that to do so would risk permanent paralysis of their daughter's arm. Although a physician may, and indeed should, express his opinion regarding preferable methods of treatment, he may not neglect to set out in a fair manner the alternatives to the procedure he advocates. Under Pennsylvania law, the Marinos were entitled to the information that one school of medical thought favors immobilizing the arm and delaying surgery indefinitely in order to facilitate spontaneous regeneration of the damaged nerve. This is undoubtedly information that reasonable parents would consider material in deciding whether to permit immediate surgery on their child's arm. Absent advice that this course of treatment represented an acceptable, though not preferable, alternative, Dr. Ballestas' remarks did not convey to the Marinos the information they needed to make an informed choice.
 
 
 26
 In concluding that the evidence supported the jury's finding that the Marinos gave informed consent to the operation, the district court ascribed much weight to the telephone consultation between Mrs. Marino and Dr. Friedman prior to the surgery. We do not doubt that there are situations in which information from another physician can adequately substitute for information not given by a patient's surgeon. This would be true if the consulting physician examines the patient personally, or if he otherwise obtains the data necessary to enable him, before consent to the operation is given, to render a medical opinion on the case. In the instant case, Dr. Friedman could have given advice sufficient to sustain the verdict for Dr. Ballestas if Dr. Ballestas had spoken directly to Dr. Friedman or if Dr. Ballestas had conveyed to Mrs. Marino precise information regarding Maria's condition that she, in turn, accurately relayed to the New Jersey physician. Neither of these scenarios occurred, however. Indeed, according to Mrs. Marino's uncontradicted testimony, Dr. Friedman told her that he could not render an opinion as to the proper course of action based on her description of the injury. Under these circumstances, it cannot fairly be said that there is evidence sufficient to sustain the district court's conclusion that the discussion between Mrs. Marino and Dr. Friedman (or any other evidence) rendered plaintiffs' consent informed.
 
 C.
 
 27
 Even though the evidence points ineluctably to the conclusion that plaintiffs did not give informed consent to the operation, we would be obliged to uphold the judgment of the district court if it properly rested on the alternative ground that plaintiffs had not proceeded on the lack of informed consent/alternative procedure theory at trial. We cannot agree, however, with the district court's conclusion that this theory was not presented. Plaintiffs pleaded the alternative procedure theory in their complaint and included it in their pre-trial memorandum. Testimony regarding the existence of an alternative procedure and addressing whether Dr. Ballestas had adequately informed Maria's parents of the alternative was presented at trial. Plaintiffs requested and received detailed jury instructions on the theory. Defendant was obviously aware that plaintiffs were proceeding on dual theories of negligence and lack of informed consent because defendant's counsel addressed all issues in direct examination of the defense witnesses.[7]
 
 
 28
 The district court, in its disposition of the post-trial motions, was apparently influenced by the fact that plaintiffs' expert, Dr. Friedman, testified almost exclusively on the negligence issue and did not, in terms, advance the informed consent theory. Indeed, the focus of Dr. Friedman's testimony was that Dr. Ballestas acted without due care in deciding to perform the operation at all; in Dr. Friedman's view, immobilization and delay (as opposed to immediate surgery) was the only viable course of treatment. Dr. Friedman thus never testified explicitly that a reasonable doctor would have told the plaintiffs about an alternative to surgery. However, this opinion was implicit in Dr. Friedman's testimony that a competent doctor would have reassured the Marinos and pursued the alternative course of action.[8] Therefore, we reject the district court's conclusion that plaintiffs did not pursue the informed consent theory at trial.
 
 IV.
 
 29
 When presented with an appeal from the denial of motions for judgment n.o.v. or, in the alternative, a new trial pursuant to Fed.R.Civ.P. 50(d), an appellate court has discretion to order the district court to enter a judgment for the appellant, to order a new trial, or to refer the question of whether to grant a new trial to the district court. Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 329, 87 S.Ct. 1072, 1080, 18 L.Ed.2d 75 (1967). In the case before us we have concluded that there was no evidence to support the jury's verdict that the Marinos were informed when they consented to the operation on their daughter's arm. The record is therefore deficient of that minimum quantum of evidence from which the jury could have declined to afford relief. Dawson, 630 F.2d at 959. However, our review of the record, including the comments of the district court, persuades us that confusion at trial resulted from plaintiffs' attempt to try the case on two negligence theories and two informed consent theories simultaneously.[9] This confusion was exacerbated by the testimony of plaintiffs' expert witness, which focused on his opinion that the defendant doctor should not have operated at all, rather than on the opinion that Dr. Ballestas should have presented plaintiffs a choice.
 
 
 30
 Given these problems, and in view of the district court's comments, we believe that the interests of justice require a new trial on the informed consent issue rather than the grant of a judgment n.o.v. for the plaintiffs. Accordingly, pursuant to our authority under Neely, we will vacate the jury verdict and remand to the district court for a new trial on the issue of informed consent. In all other respects, we affirm the judgment of the district court.
 
 
 31
 WEIS, Circuit Judge, dissenting.
 
 
 32
 I believe that the majority has improperly invaded the province of the jury, and therefore dissent from the grant of a new trial.
 
 
 33
 The district court instructed the jury that plaintiffs had the burden of proving that they did not know all the options open to them when they gave their consent to the surgery. The trial judge described the physician's duty to explain available alternatives as "what a reasonable orthopedic surgeon would tell the parents in similar circumstances, and you have heard some testimony about that."
 
 
 34
 The jury answered "No" to an interrogatory that asked "Have plaintiffs shown by a fair preponderance of the evidence that the consent given for the surgical procedure performed by Dr. Ballestas was not informed consent?" Despite this unequivocal finding that plaintiffs failed to meet the burden of proof, the majority now grants a new trial.
 
 
 35
 The majority's decision is based on the conclusion that "there was no evidence to support the jury's verdict that the Marinos were informed when they consented to the operation ... the record is therefore deficient of that minimum quantum of evidence from which the jury could have declined to afford relief." This determination overlooks the basic rule that the plaintiff has the burden of proof. Unless that burden is met, a jury has no alternative but to decline relief.
 
 
 36
 The majority concedes that there was "confusion at the trial resulting from the plaintiffs' attempt to try the case" on several theories simultaneously and that this confusion was exacerbated by the testimony of the plaintiffs' expert witness. Thus, even the majority concedes that the blame for not presenting the issue in an understandable fashion rests with plaintiffs.
 
 
 37
 The trial judge summarized the point precisely: "The real and only issue in this case was whether the defendant Ballestas was guilty of malpractice in recommending surgery and the basic question was decided against the plaintiffs." Having lost on that ground, plaintiffs now seek a new trial on a collateral issue that they tossed into the jury box without adequate preparation. If the plaintiffs' case was confusing to the jury, I fail to see how it can be faulted for finding that the burden of proof had not been satisfied.
 
 
 38
 Even under the majority's finding of confusion, the jury would be justified in finding that plaintiffs failed to meet their burden of proof. It is not the proper function of an appellate court to order a new trial simply because plaintiffs, represented by competent counsel, failed to present their case in such a manner that the issue was clear to the factfinder.
 
 
 39
 Moreover, a review of the testimony furnishes other bases for the jury's finding. The issue of informed consent in this case necessarily rested on credibility determinations. The mother testified that Dr. Ballestas told her she could not transport her daughter back to New Jersey, and that surgery must be performed within two hours. The doctor, however, denied these statements, saying he told the parents that they could take the child at any time but that he feared further damage if surgery was not performed. Clearly there was a basis for caution because the child's symptoms suggested to Dr. Ballestas that the radial nerve was trapped between bone fragments and subject to undesirable compression. Indeed, during the subsequent surgery the nerve was discovered wedged between bone fragments.
 
 
 40
 In addition, the mother testified that she telephoned the family orthopedist's office in New Jersey and discussed the matter with persons there. Whether she spoke with the doctor or other members of his staff is not clear from the record. The jury may well have found it significant that the mother did not mention whether her own orthopedist or his staff had discussed the possibility of foregoing surgery and returning home.
 
 
 41
 Essentially, what evidence plaintiffs did present as to lack of informed consent consisted of the parents' testimony. If the jury did not find that testimony credible, adequate justification existed for a finding that the burden of proof had not been met.
 
 
 42
 One of the least assailable findings by a jury is that a party has failed to meet its burden, particularly when judgments of credibility loom large. In circumstances such as those present here, an appellate court should rely heavily on the opinion of an experienced and able trial judge who was intimately familiar with all that transpired at the trial. Our review is limited, and, in circumstances such as those here, we reverse the denial of a new trial by a district judge only for an abuse of discretion. Thomas v. E.J. Korvette, Inc., 476 F.2d 471 (3d Cir.1973). The plaintiffs have failed utterly to meet that test in this appeal.
 
 
 43
 I would affirm.
 
 
 
 *
 Honorable Harold A. Ackerman, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Jurisdiction is founded on diversity of citizenship, 28 U.S.C. Sec. 1332
 
 
 [2]
 It is clear from the record that Dr. Ballestas was not an employee of the hospital, and that the hospital did not hold him out as an employee. The doctor maintained a private practice separate and apart from the hospital and merely had staff privileges there. Because there is no evidence that would support respondeat superior liability, we affirm the decision of the district court rejecting the challenge to the jury verdict in favor of defendant Gnaden Huetten Memorial Hospital
 
 
 [3]
 The district court disposed of the latter informed consent claim, saying, "We view the insertion of the metal plate as being within the authorization to perform surgery, and not as a matter for which a specific consent is required." Since plaintiff-appellants have failed to pursue this lack of informed consent theory on appeal, we conclude that they have conceded this issue
 
 
 [4]
 The interrogatories asked:
 
 
 [1]
 Have plaintiffs shown by a fair preponderance of the evidence that the consent given for the surgical procedure performed by Dr. Ballestas was not informed consent?
 
 
 [2]
 Have plaintiffs shown by a fair preponderance of the evidence that the operation performed by Dr. Ballestas was not in accordance with sound medical practice in a recognized school of medical opinion?
 
 
 [3]
 If you conclude the operation by Dr. Ballestas was a reasonable medical procedure, did Dr. Ballestas perform the surgery with a degree of skill, knowledge, and care that complied with the standard of care for a specialist in orthopedics?
 a) In connection with the size and appearance of the scar?
 b) In connection with the insertion of the metal plate?
 
 
 [5]
 We affirm the district court's disposal of the negligence claims because there is sufficient evidence to support the jury's verdict that plaintiffs failed to prove Dr. Ballestas had acted negligently in his decision to operate and in his performance of the operation. Drs. Finnegan and Lichtenfeld both testified that the choice of the surgery performed by Dr. Ballestas was within acceptable medical standards and that Dr. Ballestas had performed the surgery in an acceptable fashion. The jury was entitled to credit the testimony of these experts
 
 
 [6]
 The parties agree that Pennsylvania law is controlling
 
 
 [7]
 We cannot determine whether this theory was argued to the jury in summation because the closing arguments of counsel were not transcribed and may not have been reported
 
 
 [8]
 In view of Dr. Friedman's testimony in plaintiffs' case in chief, and of the evidence recounted in parts I and III.B. (including the testimony of Drs. Finnegan and Lichtenfeld and of Dr. Ballestas himself), we are at a loss to understand the dissent's contention that plaintiffs did not meet their burden of proof. The dissent also suggests that Dr. Friedman's failure to focus upon the alternate procedure theory in his direct testimony means that plaintiffs did not pursue this theory. In light of the facts as recounted in part I, and for the reasons set forth in this part (III.C.), the dissent is incorrect. Finally, contrary to the dissent's assertion, our review is not affected by matters of credibility; there was simply no evidence that Dr. Ballestas informed the plaintiffs about the alternative procedure
 
 
 [9]
 The district court, in its memorandum opinion denying plaintiffs' motion for a judgment n.o.v. or for a new trial, stated:
 Plaintiffs' evidence did not develop that there are two clear cut alternative methods of treating an injury such as that sustained by Maria. Although the issue of informed consent was submitted to the jury, we believe plaintiffs are belatedly seeking to convert what is essentially a medical malpractice case into a lack of informed consent claim. The testimony concerning alternative viewpoints as to treatment, in fact, came from the defense witnesses, and plaintiffs' expert opined that surgery was not an acceptable treatment under any circumstances. Dr. Ballestas acknowledged under cross-examination that some medical authorities would apply a cast to the broken arm, to permit an opportunity for the nerve damage and fracture to heal themselves. If this method of treatment proved unsuccessful the surgery would be done later. Although Dr. Ballestas may not have specifically reviewed this possible course of action in detail, he did inform Maria's parents that she could be taken home for treatment, with the reservation that delay might be harmful.