**UNITED STATES of America**

v.

**Edmund FUNARO, Jr.**

**No. CRIM.3:01 CR 17 (CFD).**

United States District Court, D. Connecticut.

March 26, 2003.

Alan J. Sobol, Gerard S. Collins, O'Connell, Flaherty & Attmore, Hartford, CT, for Defendant.

John A. Danaher, III, Peter A. Clark, James I. Glasser, Jonathan Biran, U.S. Attorney's Office, New Haven, CT, E. Gates Garrity-Rokous, Wiggin & Dana, New Haven, CT, for U.S.

### *RULING ON DEFENDANT'S MOTION TO SUPPRESS*

DRONEY, District Judge.

In December 2001, a grand jury sitting in New Haven returned a 27–count Second Superseding Indictment against Edmund Funaro, Jr. ("Funaro"), a pharmacist and owner of Visels Pharmacy ("Visels") in New Haven. Each count charges Funaro with illegally dispensing controlled substances in violation of 21 U.S.C. § 841(a)(1). The controlled substances included Percocet, Vicodin, Xanax, and Klonopin.

Pending before the Court is Funaro's Motion to Suppress Statements and Documents [Doc. # 160]. The motion seeks suppression of statements and other evidence obtained by State of Connecticut Drug Control Agent Deborah Komososki and U.S. Drug Enforcement Administration Diversion Investigator Leonard Levin during an administrative inspection of Visels on April 26, 1999. The motion also

seeks suppression of all statements and other evidence "derivatively obtained" from that inspection, including evidence and statements obtained during subsequent inspections and a June 6, 2000 search of Visels pursuant to a search warrant. Funaro claims that suppression is warranted because the information was obtained in violation of his right to "substantial and fundamental fairness" as guaranteed by the Fourth and Fifth Amendments of the United States Constitution as well as federal and Connecticut state law, regulations, and procedures. For the following reasons, the motion is DENIED.

## I. Findings of Fact

Visels is located on Dixwell Avenue in New Haven, Connecticut. Funaro is a pharmacist at Visels, as well as an owner. Dr. William Massie ("Massie"), a physician, maintained an office on Dixwell Avenue close to Visels, and has been the subject of much attention by federal and state drug control agents, as described below. Leonard Levin ("Levin") is a diversion investigator for the United States Drug Enforcement Administration ("DEA") with 22 years' experience. His duties consist primarily of preventing diversion of controlled substances into illicit markets by physicians and pharmacists. Levin is authorized to conduct inspections of pharmacies pursuant to 21 U.S.C. § 880 within a regulatory framework established by 21 C.F.R. §§ 1316.01 *et seq.* He does not carry a firearm and is not authorized to make arrests.

Before inspecting records at a pharmacy, a DEA agent is required to present the appropriate person at the pharmacy with a DEA Form 82 Notice of Inspection ("Form 82"). The Form 82 sets forth the registrant's rights, including the registrant's right to refuse an inspection without an administrative inspection warrant[1] and advises that evidence found during the inspection may be used against the registrant in a criminal prosecution.

Deborah Komoroski ("Komoroski") is an agent of the State of Connecticut Department of Consumer Protection, Drug Control Division ("State Drug Control") with approximately 15 years' experience. Like Agent Levin, her duties include monitoring the flow of legal drugs through legitimate channels in order to prevent illegal diversion of those drugs.

State Drug Control agents conduct audits and inspections of pharmacies and other entities under laws of the State of Connecticut which are similar to the federal regulatory scheme, except that State Drug Control agents are also authorized to serve search and arrest warrants. Under Connecticut law, pharmacies are required to permit State Drug Control agents to have access to records relating to their receipt and distribution of controlled substances. Also, when a State Drug Control agent enters a pharmacy to conduct an audit or an inspection, the agent is not required under Connecticut law to provide any form or other notification to the owner or operator of the pharmacy. State Drug Control agents are also directed by Connecticut statute to cooperate with other agencies in enforcing laws of the United States relating to controlled substances.

State Drug Control audits are administratively assigned in July of each year. State Drug Control agents are not involved with DEA Form 82s except when

---

1. Administrative inspection warrants may be issued by a U.S. Judge or Magistrate Judge upon a showing of "a valid public interest in the effective enforcement of this subchapter [Drug Abuse Prevention and Control] or regulations thereunder sufficient to justify administrative inspections ..." 21 U.S.C. § 880(d)(1).

the State Drug Control agent is accompanying a DEA agent.

*1987 State Drug Control/DEA Investigation of Massie*

Massie was first investigated in 1987 by State Drug Control and DEA. At that time, Massie did not have a valid Connecticut Controlled Substance Registration or a federal DEA Registration. In connection with the 1987 investigation of Massie, State Drug Control and DEA agents visited several pharmacies in the New Haven area, including Visels. Neither Visels nor Funaro was a subject or target of the 1987 investigation of Massie. No other violations were discovered relating to Massie during the 1987 investigation except the lack of the controlled substance registrations. The State Department of Consumer Protection concluded the 1987 investigation of Massie by issuing him a controlled substances certificate of registration, as did DEA.

*April 1998 Audit of Visels*

In 1997, Komoroski was assigned to conduct a regular audit of Visels. The audit was begun in April 1998 by Komoroski and State Drug Control Agent Barry Gordon ("Gordon"). No DEA investigators were present at that audit.

In the course of the April 1998 audit, the agents reviewed Visels' handling of several controlled substances, including Percocet, Ritalin, Xanax, and Vicodin. The audit revealed shortages of some of the controlled substances in ranges between approximately six and 12 percent. When State Drug Control conducts an audit of a pharmacy's controlled substances, it deems an overage or a shortage of three to five percent as an acceptable range. Anything above five percent requires additional inquiry, which may include the scheduling of another audit a year later. State Drug Control did not initiate a criminal investigation of Visels or Funaro as a result of the shortages found in the April 1998 audit. Rather, on July 2, 1998, State Drug Control scheduled a follow-up audit audit of Visels to occur the next year in order to determine whether the problems revealed by the April 1998 audit had been resolved. Komoroski was assigned to conduct this follow-up audit of Visels.

*1998–99 Criminal Investigation of Massie*

Beginning in June 1998 and continuing into 1999, State Drug Control, in conjunction with DEA and other agencies, conducted a new criminal investigation of Massie concerning his prescribing controlled substances.

Komoroski did not work on the 1998–99 criminal investigation of Massie. The case was assigned to State Drug Control Agent John Gadea ("Gadea"). However, DEA Agent Levin became involved in the 1998–99 criminal investigation of Massie in the late summer or early fall of 1998. Visels was not a subject or target of the 1998–99 criminal investigation of Dr. Massie. The investigation was not fruitful and investigative efforts were terminated in early 1999.

*April–May 1999 Follow–Up Audit of Visels*

On April 26, 1999, Komoroski began the follow-up audit of Visels that she had been assigned in July 1998. At that time, Levin was contacted by State Drug Control and asked to participate in the follow-up audit of Visels. Levin was authorized to participate in this audit of Visels under authority conferred by 21 U.S.C. § 880. DEA agents at times assist State Drug Control agents in conducting audits of pharmacies in Connecticut. For example, a DEA agent might be asked to assist in the audit of a pharmacy if there previously were record-keeping problems for controlled substances at that pharmacy. That was

the reason for Levin's assistance in the follow-up audit of Visels.

The April–May 1999 follow-up audit of Visels was not conducted as part of a criminal investigation of Visels or Funaro. In April of 1999, neither Visels nor Funaro was the subject or target of any state or federal criminal investigation. Moreover, Levin was not requested to help in the follow-up audit of Visels because of his involvement in the Massie investigation.

On April 26, 1999, when Komoroski, Levin, and Komoroski's supervisor, Herbert Strickland, arrived at Visels to begin the follow-up audit, they first met with Funaro. Levin displayed his credentials to Funaro and explained his identity and the purpose of the follow-up investigation. Levin then presented Funaro with a DEA Form 82, which detailed Funaro's rights, including his right not to consent to the inspection. He asked Funaro to review the form, and requested that Funaro give him permission to inspect Visels' records. Funaro read the Form 82 and stated that he would not sign it, but gave verbal permission to conduct the inspection. Levin told him that if he changed his mind at any time after granting consent he could require Levin to obtain an administrative inspection warrant. At no time did Levin suggest to Funaro that he might suffer any adverse consequences if he refused to sign the form or consent to the inspection.

After Funaro declined to sign the DEA Form 82 but provided verbal consent for Levin to inspect records, Levin wrote on the form that Funaro had refused to sign it, and that Funaro had given verbal consent for the inspection to proceed. Levin then signed the Form 82 himself, leaving a copy for Funaro on the pharmacy counter.

Levin and Komoroski then explained to Funaro which types of drugs they were going to audit. Funaro provided the investigators space in the pharmacy to conduct their work, and Funaro himself retrieved the records from their storage area and brought them to the investigators.

The April–May 1999 follow-up audit of Visels took several days to complete. During that period of time, Komoroski and Levin conducted an audit of the same drugs that Komoroski and Gordon had audited in April 1998. In particular, Komoroski and Levin did a physical count of the audited controlled substances; analyzed Visels' purchase records for those substances; and analyzed all the prescriptions for those substances. The agents also analyzed computerized prescription and refill records as part of the audit.

Funaro did not withdraw the verbal consent that he had given Levin during the course of the follow up audit. Also, the agents who conducted the audit did not place Funaro under arrest or tell him that he would be subject to arrest if he did not cooperate with them. For most of the time that Komoroski and Levin were at Visels conducting the audit, Funaro was behind the prescription counter filling prescriptions or talking on the telephone. At all times Funaro was free to go about his business, wait on customers, use the telephone and leave the pharmacy. At no time did Komoroski or Levin carry or display a firearm in Funaro's presence.

The agents did not seize any records from Visels in the course of the April–May 1999 follow-up audit. The only records that the agents took with them from Visels were the computerized prescription printouts and refill logs that Funaro voluntarily provided.

The final audit results revealed overages or shortages in the audited controlled substances that ranged from 0.28 percent to 4.14 percent. The audit also revealed several record-keeping violations by Visels.

In the course of conducting the April–May 1999 follow-up audit of Visels, Komoroski and Levin saw prescriptions for controlled substances which had been written by Massie. The agents noticed that some prescriptions were filled too early,[2] and that others had been filled for more doses than were called for on the prescriptions.

Komoroski, Levin, and Funaro spoke with each other from time to time as the agents were conducting the April–May 1999 follow-up audit at Visels, sometimes discussing the records the agents were reviewing, including the Massie prescriptions. Funaro was in the prescription department at Visels when Komoroski and Levin spoke with him about the Massie prescriptions. When asked about Massie's prescriptions, Funaro made certain comments concerning the doctor's prescribing practices and the character of his patients.[3] At this time, Levin was aware that Massie was the subject of a criminal investigation, and that Funaro's responses to the questions were relevant to the investigation of Massie. At some point during the audit, Funaro inquired of Levin if he were the subject an inquiry other than the audit, and since Levin did not consider him to be the subject or target of any criminal investigation, he told him he was not.

At the conclusion of the audit, Levin advised Funaro that he had noted certain discrepancies in Funaro's record-keeping, and advised him that he would send him a letter detailing those issues. On May 10, 1999, Levin caused a letter to be sent from the DEA to Funaro setting out various record-keeping violations, and requesting that Funaro respond in writing.

Levin also wrote up a report about the April–May 1999 follow-up audit in the form of a DEA 6[4] dated May 13, 1999. The report indicated that the file was titled "Visel's Pharmacy." Box number 4 of the report, entitled "G–DEP Identifier," was left blank, signifying that the audit was not a criminal investigation. Box number 10 contained a coded identifier "RP30," also signifying that it was a non-criminal administrative investigation of a pharmacy.

Funaro responded to DEA's May 10, 1999 letter on May 19, 1999. On June 1, 1999, Levin wrote a final report administratively closing the Visels matter, which was approved by his supervisor on or about June 7, 1999. That report was also coded RP30, signifying a non-criminal investigation.

After the agents completed the April–May 1999 follow-up audit of Visels, neither State Drug Control nor DEA opened a criminal investigation of Visels or Funaro, despite the early fills and overfills that the agents had noticed during the audit. Levin and his supervisor concluded that the letter Funaro had sent to DEA on May 19, 1999, was sufficient to warrant closing the Visels Audit. Neither Visels nor Funaro became a subject or target of the 1998–99 criminal investigation of Massie throughout the course of the follow-up audit or its resolution.

*June 3, 1999 Visit to Visels by Levin and Leo Roberge*

In June of 1999, Levin had additional discussions with State Drug Control

---

2. Filling a prescription "early" means filling a prescription for a controlled substance within the coverage period of a prescription the patient had previously received for the same controlled substance.

3. These oral statements appear to be the principal focus of the motion to suppress here.

4. The DEA–6 is the standard form used by DEA agents to record information acquired during an investigation.

agents regarding the then-dormant Massie criminal investigation. They decided to talk to some pharmacists in the neighborhood of Massie's office. On June 3, 1999, Levin and State Drug Control Agent Leo Roberge ("Roberge") visited several pharmacies, including Visels. They spoke to either Funaro or his father on that occasion, but did not examine any records. Levin did not provide Funaro or his father with a DEA Form 82 for this visit.

Levin wrote a DEA 6 concerning the June 3, 1999 visit to Visels. It contained a file title of "William Massie, MD," and had a different file number than that contained on Levin's reports relating to the April–May 1999 follow-up audit of Visels. The report contained a G–DEP identifier as well as a coded identifier of PM40, indicating that it was a report pertaining to the criminal investigation of a physician. As of the time of the June 1999 visit to Visels, Massie was the subject or target of a criminal investigation, but no one at Visels was yet in that position.

*1999–2000 Criminal Investigation of Massie*

Beginning in September 1999 and continuing through 2000, State Drug Control, DEA, and other agencies conducted another criminal investigation of Massie. At State Drug Control, the 1999–2000 investigation was given a case number different than that given to the 1998–99 investigation to which Gadea had been assigned. Komoroski was assigned to work on the 1999–2000 criminal investigation of Massie. Gadea was not involved in this new investigation of Massie.

Levin worked on both the 1998–99 criminal investigation of Massie with Gadea and Roberge, as well as the 1999–2000 criminal investigation of Massie with Komoroski. At the beginning of the 1999–2000 criminal investigation of Massie, neither Visels nor Funaro was a subject or a target of that investigation. Komoroski, Levin, and the agents working with them on this new criminal investigation of Massie conducted audio and video surveillance of individuals obtaining prescriptions for controlled substances from Massie without any medical examination being conducted. The agents also learned through a cooperative witness that patients of Massie were selling controlled substances outside of Massie's office which had been obtained by way of prescriptions written by Massie and filled at Visels and at Arrow Pharmacy ("Arrow"). Although the agents learned in the course of their investigation that some of the prescriptions written by Massie had been filled at Visels, at that point they still did not consider either Visels or Funaro to be targets of the investigation

In connection with their efforts to investigate Massie, in early June 2000 the agents obtained a state search and seizure warrant for medical records located in Massie's office. At the same time, the agents also obtained state search warrants for prescriptions written by Massie and filled at Visels and Arrow. The agents sought to obtain the prescriptions to use as evidence only against Massie. Before applying for the state search warrants for prescriptions at Visels, on March 24, 2000, and May 23, 2000, State Drug Control agents inspected prescription records at Visels. No DEA agent was present at the inspection of Visels on either March 24 or May 23, 2000. Accordingly, the State Drug Control agents did not present the pharmacist on duty at Visels on those occasions with DEA Form 82s. As of May 23, 2000, neither Visels nor Funaro was a target of the criminal investigation involving Massie.

As a result of the 1999–2000 criminal investigation conducted by State Drug Control, DEA, and other agencies, Massie was arrested on June 5, 2000 on state

charges of illegally prescribing narcotics and controlled substances and conspiring to do the same. His office was searched that same day pursuant to the state search warrant. The next day, June 6, 2000, Visels was searched pursuant to the state search warrant. Prior to Massie's arrest on June 5, 2000, the agents did not attempt to send any cooperating witnesses or undercover police officers into Visels to fill prescriptions. They did not take such investigative steps because the agents were not investigating Funaro or Visels at that time. After the arrest of Massie became publicly known, the investigators continued their investigation for several months. In particular, the agents interviewed several of Massie's customers, executed additional search warrants, conducted a survey of New Haven area pharmacies about Massie's prescriptions, interviewed pharmacists and technicians at several area pharmacies, and analyzed the prescriptions seized from the various pharmacies. The agents then entered data concerning approximately 15,000 seized prescriptions into a database.

As a result of the investigation conducted after the June 5, 2000 arrest of Massie, four pharmacists in the New Haven area, including Funaro, emerged as additional targets of the criminal investigation of Massie. Funaro became a target of the criminal investigation in the late fall of 2000. A federal grand jury returned an indictment including drug conspiracy charges against Massie, Funaro, and others in January 2001.

*Summary Findings of Fact*

1) Funaro was not the target of a state or federal criminal investigation before June 6, 2000.

2) Funaro voluntarily consented to the April–May 1999 follow-up audit of Visels. This audit was authorized by state and federal statutes and regulations and was lawfully conducted.

3) In connection with the April–May 1999 follow-up audit of Visels, Funaro voluntarily provided Komoroski and Levin with prescription and refill records, and Komoroski and Levin took possession of such records in order to fulfill their lawful functions.

4) The April–May 1999 follow-up audit of Visles by Levin and Komoroski was not conducted in bad faith to obtain evidence for a criminal prosecution of either Massie or Funaro, but was part of the ordinary function of auditing records for compliance with state and federal controlled substance laws.

5) Funaro was never in custody during the course of the April–May 1999 follow-up audit of Visels, and Funaro's statements to Levin and Komoroski during that audit were voluntary and were not the products of unlawful inducement.

*II. Findings of Law.*

*A. Burden of Proof*

It is well settled that "the burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Arboleda,* 633 F.2d 985, 989 (2d Cir.1980) (internal quotation marks and citation omitted); *see also United States v. Masterson,* 383 F.2d 610, 614 (2d Cir.1967) ("On a motion to suppress under Rule 41(e) of the Federal Rules of Criminal Procedure, the burden is on the defendant to prove all facts necessary to sustain the motion."). However, "[t]he movant can shift the burden of persuasion to the Government and require it to justify its search . . . when the search was conducted without a warrant." *Arboleda,* 633 F.2d at 989.

When a defendant's statement sought to be admitted against him at trial is alleged to have been involuntary under the Fifth

Amendment, the burden is on the Government to prove by a preponderance of the evidence that the statement in fact was voluntary. *See Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) ("Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir.1997) ("The prosecution bears the burden of demonstrating by a preponderance of the evidence that a confession was voluntary."); *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991) ("The prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice."). Similarly, when a defendant seeks to suppress evidence allegedly seized in a search in violation of the Fourth Amendment, the evidence will not be suppressed if the government can demonstrate by a preponderance of the evidence that consent for the search was voluntary. *See United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993) ("The prosecution bears the burden of showing, by a preponderance of the evidence ... that the consent was, in fact, freely and voluntarily given."); *U.S. v. Buettner–Janusch,* 646 F.2d 759, 764 (2d Cir.1981) ("[T]he Government must show, by a preponderance of the evidence, that the consent to search was freely and voluntarily given"); *United States v. Robinson,* No. 301CR276CFD, 2002 WL 1359689, at *1 (June 18, 2002 D.Conn.) ("If the government relies on consent to the search, as is the case here, the government must demonstrate by a preponderance of the evidence that the consent was voluntary.").

B. *Funaro Was Not a "Target" of a Criminal Investigation in April–May 1999*

▮ Funaro argues that by not advising him that he was a "target" or "subject" of the Massie investigation during the April–May 1999 follow-up audit, Levin and Komoroski violated the "operating policies and procedures" of the U.S. Department of Justice (which require that targets be informed of their status before being questioned. *See* United States Attorney's Manual § 9–11.151.) In response, the Government argues that 1) Funaro was not yet the target of any criminal investigation at the time of that audit and 2) even if Funaro had been a target, suppression is not the proper remedy for violation of Department of Justice Policy.

As support for his assertion that he was then a target of a criminal investigation, Funaro stresses the "corresponding duty of a pharmacist in relation to a prescribing physician" as set forth in 21 C.F.R. § 1306.04 ("The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."). *See* Def.'s Prop. Findings [Doc. # 281], at 15. Funaro argues that in light of this corresponding duty, and in light of the fact that the agents were aware of the Massie criminal investigation, the agents must have been aware that Funaro could have been the target of a criminal investigation. Funaro also relies on the fact that the Government, in its Omnibus Response to Pending Motions [Doc. # 169], indicated that for the Massie conspiracy to function it needed a doctor, patients, and pharmacists. However, the existence of a criminal investigation of a doctor for diversion activity, even coupled with the corresponding duty of pharmacist set forth in 21 C.F.R. § 1306.04, does not mean that any pharmacist who had filled that doctor's prescriptions was necessarily or automatically a "target" of an investigation of the doctor. Rather, the individual

factual circumstances of the pharmacist must be evaluated. Here, based on the testimony of agents Levin and Komoroski, the administrative reports filed by the agents related to the audit, and the other evidence presented at the hearing, the Court finds that, as of the time of the April–May 1999 follow-up audit, and more specifically when Funaro made oral statements on April 26, 1999, he was not the target of a criminal investigation, and therefore the agents conducting the audit were not required to advise him that he was a target.

C. *The Agents' Inspections of Records at Visels Did Not Violate the Fourth Amendment*

Funaro also argues that the agents violated his Fourth Amendment rights with regard to the April–May 1999 follow-up audit of Visels. In support of this argument, Funaro asserts that the Government has not proved that he gave informed consent for the that audit of Visels. Funaro also claims that the agents should have had at least an administrative inspection warrant, if not a criminal search warrant, on each occasion that they entered Visels between April 1999 and May 2000.

1. *Funaro Provided Informed Consent for Visels' Follow–Up Audit*

■ In his moving papers, Funaro maintained that Levin had not provided him with a Form 82 on April 26, 1999, when the agents arrived to begin the audit of Visels. *See* Mem. of Law in Supp. of Def.'s Mot. to Supp. Statements and Documents [Doc. # 161], at 10–11 & n. 3. Under federal regulations, before a DEA agent may participate in an inspection or audit of a pharmacy, the DEA agent must first present to the person in charge of the pharmacy appropriate credentials, advise him or her of the purpose of the visit, and provide him or her with written notice of inspection authority. Those requirements, as well as the information required to be disclosed to the pharmacy in order to obtain consent and the right to refuse consent for the inspection are set forth in a form known as a "Form 82." *See* 21 C.F.R. §§ 1316.05–08. Funaro also argues that the absence of a second witness's signature on the Form 82 that Levin claims was presented to Funaro shows that he did not give Levin consent for the audit.

However, it is not necessary for two witnesses to sign the Form 82 in order for valid informed consent to be obtained. Funaro gave his informed consent to Levin verbally, notwithstanding his unwillingness to sign the Form 82. Levin presented Funaro with a Form 82, informed him of the nature and scope of the audit, informed him of his right to refuse, and Funaro gave his oral consent to proceed. There was no compulsion on the part of Levin, and Levin duly noted the oral consent on the form. Levin also told Funaro that if he changed his mind at any time after granting consent he could require Levin to obtain an administrative inspection warrant. At no time did Levin suggest to Funaro that Funaro might suffer any adverse consequences if he refused to sign the form or consent to the inspection.

Funaro also argues that because Levin and Komoroski sought to inspect Visels records not just for an administrative purpose, but also to gather evidence for a criminal diversion investigation, Funaro could not have given his "informed" consent to the inspection. *See* Def. Prop. Findings [Doc. # 281], at 27. However, even if the agents had intended to gather evidence for a criminal investigation of Massie in addition to conducting an administrative audit of Visels' controlled substance records, they would not have been

required to tell Funaro about the Massie criminal investigation in order for Funaro to provide "informed" consent to the administrative inspection.

Funaro relies on *Marino v. Ballestas*, 749 F.2d 162 (3d Cir.1984) for the proposition that his consent was not truly "informed" without being notified that one purpose of the inspection was to further a criminal diversion investigation. In *Marino*, the Third Circuit, construing Pennsylvania law in a civil medical malpractice case under federal diversity jurisdiction, stated: "The Pennsylvania Supreme Court has defined 'informed consent' as consent made with knowledge and understanding of the nature of the undertaking. A patient can give informed consent only when he or she fully understands the nature of the proposed operation and is apprised of all of its possible consequences." *Id.* at 167 (citation omitted). The *Marino* Court also pointed to a Pennsylvania Superior Court decision which "recognized a patient's right to be informed of all recognized alternative methods of treatment and stated that a physician fulfills his duty of disclosure only when 'the physician [has] disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment.' " *Id.* at 167–68 (alterations by the Court).

However, informed consent under Pennsylvania law in the context of surgical procedures is not analogous to informed consent under DEA regulations relating to administrative inspections of pharmacies which dispense controlled substances. The DEA Form 82, following DEA regulations, adequately informs a pharmacist of the nature and scope of the investigation as a predicate for consent. Also, the Form 82 warned Funaro that any evidence un-covered during the audit could be used against him. While he did not sign the Form 82, Funaro verbally consented to the inspection after reading it and after Levin orally supplemented the form's information. Funaro was also told that he could require Levin to obtain an administrative inspection warrant, and that he could withdraw his consent to the administrative inspection at any time during the course of the audit. Levin was not required to tell Funaro anything more in order for Funaro's consent to be "informed" within the meaning of DEA regulations or under the Fourth Amendment. *See* 21 C.F.R. § 1316.08; *cf. United States v. Thriftimart, Inc.*, 429 F.2d 1006, 1010 (9th Cir. 1970) ("even where FDA inspectors did not explicitly warn managers of food warehouse that they could withhold consent to administrative inspection without a warrant, subsequent consent was not unknowing or involuntary; the managers were presented with a clear opportunity to object to the inspection and were asked if they had any objection. Their manifestation of assent, no matter how casual, can reasonably be accepted as waiver of warrant."). Accordingly, the records presented by Funaro during the follow-up audit and any oral statements made by him during its course were voluntary.

2. *Each Inspection of Records at Visels in 1999 and 2000 Was Lawful.*

▮ Funaro also argues that the agents violated his Fourth Amendment rights by reviewing records at Visels in connection with a criminal investigation on several occasions after the follow-up audit in 1999 and 2000 without first obtaining an administrative search warrant or a criminal search warrant. Law enforcement agents may conduct an administrative inspection for the simultaneous pursuit of an administrative objective and the gathering of evidence for criminal purposes if the ad-

ministrative inspection is authorized and legitimate. *See United States v. Gel Spice Co., Inc.,* 773 F.2d 427, 432–33 (2d Cir.1985); *Colonnade Catering Corp. v. United States,* 410 F.2d 197, 205 (2d Cir. 1969), *rev'd on other grounds,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *United States v. Nechy,* 827 F.2d 1161, 1165–66 (7th Cir.1987); *United States v. Acklen,* 690 F.2d 70, 73–74 (6th Cir.1982); *In re Searches and Seizures Conducted on October 2 and 3, 1980,* 665 F.2d 775, 776–77 (7th Cir.1981); *United States v. Prendergast,* 585 F.2d 69, 70–71 (3d Cir. 1978); *United States v. Goldfine,* 538 F.2d 815, 819 (9th Cir.1976).

■ Funaro relies on *United States v. Enserro,* 401 F.Supp. 460 (W.D.N.Y.1975) and *United States v. Pugh,* 417 F.Supp. 1019 (W.D.Mich.1976) to support his argument that the evidence obtained during these inspections is tainted by the agents' simultaneous pursuit of a criminal investigation. In both of these cases, the courts concluded that the pharmacists had not given valid consent to an inspection even though they had each signed a Form 82. In *Enserro,* however, the DEA agents had told the pharmacist on duty that, if he did not sign the Form 82, he would be subject to federal criminal penalties. *Enserro,* 401 F.Supp. at 462. As a result, the Government conceded that there was no legally effective consent to the administrative search. *Id.; cf. United States v. Curiale,* 414 F.2d 744 (2d Cir.1969) (where the agents were aware that there was no probable cause basis for the issuance of a search warrant, Court of Appeals expressed reservation as to whether consent search would have been upheld if the agents had allowed the defendant to base his consent on the mistaken belief that a warrant could be obtained). Faced with a warrantless search as to which there had not been valid informed consent, the Court suppressed the evidence gathered during that search as well as statements made by the defendant. *See Enserro,* 401 F.Supp. at 464; *see also United States v. Anile,* 352 F.Supp. 14 (N.D.W.Va.1973) (suppressing evidence obtained in warrantless search of pharmacy due to lack of effective consent for inspection; in response to defendant's question whether he had a choice to refuse inspection, the agents told the defendant that he did not).

In *Pugh,* the agents used a previous version of the Form 82 which did not recite the rights listed in 21 C.F.R. § 1316.08(b), including a warning that items could be seized from the pharmacy. After the defendant pharmacist signed the Form 82, the agents reviewed and (unbeknownst to the pharmacist) seized records. *Pugh,* 417 F.Supp. at 1021–22. At the suppression hearing, an agent testified that he had read the pharmacist the section 1316.08(b) rights, but the district court credited the testimony of the defendant pharmacist, who denied that the agent had read those rights to him. *See id.* Thus, the *Pugh* Court concluded that the pharmacist had not consented to an administrative seizure of pharmacy records; rather, the defendant had knowingly and voluntarily consented only "to an inspection of the type [he] had been subjected to many times before; to an auditing of his records and even to a copying of those records, but not to search and seizure." *Id.* at 1022. As in *Enserro,* the Court in *Pugh* was presented with a situation in which there had been a warrantless search of pharmacy records based on a consent that was not informed. Accordingly, the Court suppressed the evidence seized during the warrantless search. *See id.* at 1022–23. In contrast to *Enserro* and *Pugh,* however, the Court here has determined that Funaro gave valid verbal voluntary consent to the April–May 1999 follow-up audit of Vi-

sels after having read the revised Form 82 and being fully advised of his rights.

Funaro also relies on *United States v. Lawson*, 502 F.Supp. 158 (D.Md.1980) in which a DEA agent applied for an administrative inspection warrant at the request of an Assistant United States Attorney for the sole purpose of gathering evidence for a criminal investigation. By the time of the putative administrative inspection, the Government had decided to prosecute the defendant pharmacist whose premises was searched. *Lawson*, 502 F.Supp. at 164. The Court concluded that the administrative inspection was a sham and held that the Government should have obtained a criminal search warrant and should not have used an administrative search warrant and its lesser showing of probable cause. *See id.* at 165. Here, in contrast to *Enserro*, *Pugh*, and *Lawson*, even assuming that the agents had as one of their goals the furtherance of a criminal investigation of Massie, the Court concludes that they were primarily engaged in a legitimate administrative audit of Visels[5] and that the criminal investigation of Massie had not focused on Funaro as a subject or target.

Although this case is factually distinguishable from Lawson, *Pugh*, and *Enserro*, to the extent these cases conflict with Second Circuit precedent such as *Gel Spice* and *Colonnade Catering*, this Court is bound to follows the latter cases and reject the former. *Cf. United States v. Zaki*, 1992 WL 210320, at *8 n. 3 (E.D.Pa. Aug.24, 1992) (declining to follow *Lawson* in favor of controlling Third Circuit prece-

dent (*Prendergast*)). In *Gel Spice*, the Second Circuit held that where the FDA had decided to pursue criminal charges against the defendant, they were still permitted (indeed, they were *obligated*) to continue civil inspections during the pendency of the criminal investigation. The Court reasoned that "if it were otherwise, anytime a prosecution was undertaken, the FDA would be precluded temporarily in that particular instance from protecting the health and safety of the public, although this function constitutes the main purpose of the Act." *Gel Spice*, 773 F.2d at 432. That same reasoning is applicable here. Similarly, in *Colonnade Catering*, the Second Circuit upheld the seizure of the defendant's property made during an inspection to determine whether liquor bottles were being resealed properly. The defendant argued that "although a routine 'administrative' search might be reasonable, the existence of some [specific] ground for the search renders it a search pursuant to a 'criminal investigation' for which a warrant should be required." *Colonnade Catering*, 410 F.2d at 205. The Court rejected this argument and held that searches conducted pursuant to "limited statutory authority are reasonable within the meaning of the Fourth Amendment, whether or not there is a reasonable basis for believing that evidence of such violations may be found on the premises searched." *Id.* Here, unlike the situations in *Gel Spice* and *Colonnade Catering*, Funaro was not even the target of a criminal investigation at the time of the April–May 1999 follow-up audit. However, even if he

---

**5.** Indeed, Funaro appears to concede that at least one purpose of the April and May 1999 inspections was a legitimate administrative audit:

> The purpose for the entry into Visels Pharmacy from April 26, 1999 to May 5, 1999 was two-fold. The investigators were there both for the purpose of administrative type

violations, and as part of a continuing investigation into Dr. Massie's practices, and ... the investigators were wearing "two hats in this situation", one hat for a standard regulatory scheme, and one hat from the criminal investigatory aspect.

Def. Proposed Findings [Doc. # 281], at 20, ¶ 119.

had been the target of an investigation, "standing alone this does not imply or suggest that the [audit was] conducted in bad faith." *Gel Spice,* 773 F.2d at 432. Finally, although *Gel Spice* recognizes that bad faith use of administrative process for a criminal prosecution may warrant suppression of evidence, Agents Levin and Komoroski were acting in good faith in April and May 1999 during the follow-up audit of Visels. They were conducting that audit for its proper purposes and with appropriate intent.

■ With regard to the June 3, 1999 visit to Visels by Levin and Leo Roberge, the agents did not search or seize any records, but merely asked questions of the pharmacist on duty. Accordingly, Levin was not required to provide the pharmacist with a Form 82. Nor did Levin and Roberge need an administrative search warrant or a search warrant to ask questions in connection with the criminal investigation of Massie in a non-custodial setting.

■ The March 24, 2000, and May 23, 2000, reviews of records at Visels by Gordon and Komoroski, respectively, also were lawful. Because no DEA agents were present during those surveys, no Form 82 was required to be presented to the pharmacist on duty at Visels. Under Connecticut law, State Drug Control agents may review prescription records at a pharmacy without obtaining a search warrant or any other form of process. *See* C.G.S. § 21a–261; *see Russo,* 790 A.2d at 1146 & n. 27. This approach was also consistent with the Fourth Amendment.

3. *Evidence "Derivatively Obtained" from the April–May 1999 Follow– Up Audit*

Funaro also argues that, because the statements and other evidence obtained during the April–May 1999 follow-up audit were "tainted" by the agents' failure to follow federal procedures and regulations, that "all statements and evidence derivatively obtained thereafter," including the evidence gathered pursuant to the search warrant executed at Visels on June 6, 2000 in connection with the renewed Massie investigation. However, as discussed above, because the Court has determined that Funaro's consent to the follow-up audit was valid, there was no such "taint." Therefore, the Court will also not order the suppression of any evidence "derivatively obtained" from this audit.

D. *Funaro's Fifth Amendment Rights Were Not Violated.*

Funaro's Fifth Amendment claim appears to be two-fold: (1) because he could have been a subject or target of the criminal investigation involving Massie, the agents should not have questioned him about the Massie prescriptions during the April–May 1999 follow-up audit of Visels without affording him "the protections of law," and (2) suppression of all statements attributed to Funaro and all derivatively obtained information is warranted because Levin did not follow DEA policies and procedures regarding Form 82s and informed consent.

1. *Funaro as a Target of the Investigation*

■ As indicated above, the Court has concluded that Funaro was not the subject or target of a criminal investigation at the time of the April–May 1999 follow-up audit. However, even if Levin and Komoroski had viewed Funaro as a subject or target of a criminal investigation at any time during that audit, they were under no obligation to provide him with *Miranda* warnings prior to asking him questions about Massie, because Funaro was never in custody during the audit. *See United States v. Mitchell,* 966 F.2d 92, 98 (2d

Cir.1992); *United States v. Burke,* 700 F.2d 70, 84 (2d Cir.1983).

Additionally, as noted above, Levin and Komoroski were present in Visels conducting a legitimate administrative audit. Funaro has cited no authority for the proposition that it was impermissible for the agents to ask him questions that also may have been relevant to the Massie criminal investigation, based on the information uncovered during the audit. The agents were permitted to ask Funaro questions as long as he was not in custody. Funaro had no obligation to respond, nor were any responses coerced from him. Moreover, he had been informed that he could withdraw his consent to the administrative search at any time and have Levin obtain an administrative inspection warrant to continue it. Although Funaro asked Levin whether he was the subject of an inquiry, Funaro subsequently voluntarily engaged in conversation with the agents.

### 2. *Violations of Agency Policies and Regulations*

■ Funaro also claims that Levin's "failure to follow DEA policies and procedures regarding Form 82s and informed consent, requires that the evidence obtained on April 26, 1999 and thereafter ... must be suppressed." Def. Prop. Findings [Doc. # 281], at 30. However, even assuming that the agents did consider Funaro to be a target or subject of the Massie criminal investigation at that time, their failure to follow agency regulations not mandated by the Constitution or federal statute does not, by itself, provide a basis to suppress evidence obtained in violation of those agency regulations. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (failure of IRS agent to follow IRS electronic surveillance regulations before recording conversations between defendant and agent did not re-quire suppression of tape recordings in prosecution of defendant for bribery of the agent); *United States v. Felipe,* 148 F.3d 101 (2d Cir.1998) (even if correctional facility violated regulations by intercepting defendant's outgoing mail, he was not entitled to suppression of intercepted letters). Here, Levin was not prohibited by federal law from seeking verbal consent from Funaro to conduct an administrative inspection, and he provided Funaro with all the necessary information prior to obtaining such consent. In addition, neither the Constitution nor any federal statute required that two witnesses' signatures be on the Form 82 that Funaro refused to sign. Nor does the language of 21 C.F.R. § 1316.08 require that a Form 82 have two signatures in all circumstances. *See* 21 C.F.R. § 1316.08(b) (*"Wherever possible,* informed consent shall consist of a written statement signed by the owner, operator, or agent in charge of the premises to be inspected and witnessed by two persons") (emphasis added). However, even assuming that the absence of a second witness's signature on the Form 82 was a violation of DEA policy, such a violation did not violate Funaro's rights under the Constitution or under any federal statute, and therefore does not warrant suppression. Thus, the evidence that the agents obtained at Visels on April 26, 1999, and thereafter, will not be suppressed.

For the preceding reasons, the Court concludes that there were no violations of Funaro's Fourth or Fifth Amendment rights stemming from the conduct of the government agents at the April–May 1999 follow-up audit or at any point thereafter. Therefore, Funaro's Motion to Suppress Statements and Documents [Doc. # 160] is DENIED.